**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

--------------------------------------------------------------- x

In re:

Augustus Intelligence Inc.,

               Debtor.

--------------------------------------------------------------- x

Brian Ryniker in his capacities as Litigation Trustee of Augustus Intelligence Inc., and as Assignee of Investors Larisse SA, Valnon Holding GmbH, Jaws Equity Owner 113, LLC, Lohengrin Beteiligungsgesellschaft mbH, Manfred Swarovski Jr., KRC Beteiligungs GmbH, Spitzberg Ventures GmbH, Elisabeth Swarovski, Kirsten Hager, Lumber Lane Investments LLC, Gembec I LLC, Mark and Susan Didea, Stefan von Liechtenstein, Pacific Investments and Technologies Ltd., and Chepstow Capital GmbH,

               Plaintiffs,

        v.

Kevin Washington, Estate of Wolfgang Haupt, William Mason, Pascal Weinberger, William Webster, Philip Amthor, Christopher Kahn, Rubicon Investment Partners, L.P., and Rubicon Investment Partners (Cayman), Ltd. and John Does 1 through 100 inclusive,

               Defendants.

--------------------------------------------------------------- X

Chapter 11
(Small Business Subchapter V)

Case No. 21-10744 (JTD)

Adv. Pro. No. 23-_____ (JTD)

## <u>COMPLAINT</u>

Brian Ryniker, solely in his capacity as the post-confirmation trustee (the "<u>Trustee</u>" or "<u>Plaintiff</u>") of the litigation trust (the "<u>Augustus Trust</u>") of Augustus Intelligence Inc. ("<u>Augustus</u>," the "<u>Company</u>" or the "<u>Debtor</u>"), and as assignee of investors Larisse SA, Valnon Holding GmbH, Jaws Equity Owner 113, LLC, Lohengrin Beteiligungsgesellschaft GmbH, Manfred Swarovski Jr., KRC Beteiligungs GmbH, Spitzberg Ventures GmbH, Elisabeth Swarovski, Kirsten Hager, Lumber Lane Investments LLC, Gembec I LLC, Mark and Susan Didea, Stefan von Liechtenstein,

Pacific Investments and Technologies Ltd., and Chepstow Capital GmbH (collectively, the "Augustus Investors"), by and through his undersigned co-counsel, as and for his Complaint (the "Complaint") against Kevin Washington, Estate of Wolfgang Haupt, William Mason, Pascal Weinberger, William Webster, Philip Amthor, Christopher Kahn, Rubicon Investment Partners, L.P., and Rubicon Investment Partners (Cayman), Ltd. and the Doe Defendants (collectively, the "Defendants"), respectfully alleges as follows:

## NATURE OF THE ACTION

1.    The Trustee has commenced this proceeding to enforce the rights and pursue valuable claims of the Augustus Trust against the Defendants for breach of contract, common law fraud, conspiracy to commit fraud, breaches of fiduciary duties and to recover assets of the Augustus Trust and to the extent any such assets were improperly transferred out of Augustus, (i) to avoid such transfer as an avoidable fraudulent transfer and recover such assets as assets of the Augustus Trust, (ii) an order for turnover of any transferred Augustus Investment Assets, pursuant to Section 542 of the Bankruptcy Code and state law common law for conversion, and (iii) a judgment for unjust enrichment against any defendants who wrongfully received any Augustus assets.

2.    The Trustee is also asserting, on behalf of the Augustus Investors, claims against the Defendants for securities fraud and common law fraud, conspiracy to commit fraud, and breaches of fiduciary duties.

## THE PARTIES

3.    **Trustee**.  The Trustee was appointed pursuant to the Bankruptcy Court's Confirmation Order (defined below).  Among other things, the Confirmation Order and the Debtor's Plan (defined below): (i) established the Augustus Trust, (ii) approved the Liquidating Trust Agreement, (iii) approved the Debtor's transfer to the Augustus Trust of all its right, title

and interest in and to its assets and claims, and (iv) approved the Augustus Investors' assignment to the Litigation Trustee any individual claims or causes of action they may have in connection with the purchase of their Equity Interest in the Debtor (the "Assigned Litigation Claims").

4.       **Augustus Investors**.  The Augustus Trustee asserts as assignee of the Assigned Litigation Claims set forth in this Complaint from the following parties:

A.       Larisse SA, a Swiss company, which, according to the Debtor's books and records, (i) has an address at Baarerstrasse 22, 6300 Zug, Switzerland, and (ii) purchased 127,811 Augustus equity shares for a total purchase price of $11,344,504.36;

B.       Valnon Holding GmbH, an Austrian company, which, according to the Debtor's books and records, (i) has an address at Dr. Schoberstrasse 81, 1130 Vienna, Austria, and (ii) purchased 56,331 Augustus equity shares for a total purchase price of $4,999,939.56;

C.       Jaws Equity Owner 113, LLC, a Delaware limited liability company, which, according to the Debtor's books and records, (i) has an address at 1601 Washington Ave, Ste. 800, Miami Beach, FL 33139, and (ii) purchased 45,065 shares for Augustus equity shares for a total purchase price of $3,999,969.40;

D.       Lohengrin Beteiligungsgesellschaft GmbH, a German company, which, according to the Debtor's books and records, (i) has an address at c/o BauConcept Gesellschaft für Immobilien-Investitionen mbH Katharinenstr. 12, 10711 Berlin, Germany, and (ii) purchased 25,271 Augustus equity shares for a total purchase price of $2,243,053.96;

E.       Manfred Swarovski Jr., an individual, who, according to the Debtor's books and records, (i) has an address at Blattenwaldweg 8, 6112 Wattens, Austria, and purchased 19,601 Augustus equity shares for a total purchase price of $1,739,784.76;

F.      KRC Beteiligungs GmbH, a German company, which, according to the Debtor's books and records, (i) has an address at Lauenhagen 24a, 17335 Strasburg, Germany, and (ii) purchased 18,945 Augustus equity shares for a total purchase price of $1,681,558.20;

G.      Spitzberg Ventures GmbH, a German company, which, according to the Debtor's books and records, (i) has an address at c/o Guttenberg'sche Hauptverwaltung Zweigstrasse 10 80336 München Germany, and (ii) purchased 16,900 Augustus equity shares for a total purchase price of $1,500,044.00;

H.      Elisabeth Swarovski, an individual, who, according to the Debtor's books and records, (i) has an address at Blattenwaldweg 8, 6112 Wattens, Austria, and (ii) purchased 12,707 Augustus equity shares for a total purchase price of $1,127,873.32;

I.      Kirsten Hager, an individual, who, according to the Debtor's books and records, (i) has an address at Liebigstr. 41 80538 Munich Germany, and (ii) purchased 3,853 Augustus equity shares for a total purchase price of $341,992.28;

J.      Lumber Lane Investments LLC, a Delaware limited liability company, which, according to the Debtor's books and records, (i) has an address at 251 Little Falls Drive, Wilmington, DE 19808, and (ii) purchased 2,817 Augustus equity shares for a total purchase price of $250,036.92;

K.      Gembec I LLC, a Delaware limited liability company, which, according to the Debtor's books and records, (i) has an address at 1650 Market, Suite 2800, Philadelphia, PA 19103, and (ii) purchased 2,817 Augustus equity shares for a total purchase price of $250,036.92;

L.      Mark and Susan Didea, individuals, who, according to the Debtor's books and records, (i) have an address at 2717 Ardsley Dr., Orlando, FL 32804, and (ii) purchased 2817 Augustus equity shares for a total purchase price of $250,036.92;

M.      Stefan von Liechtenstein, an individual, who, according to the Debtor's books and records, (i) has an address at Schlossallee 4 A,-9232 Rosegg Austria, and (ii) purchased 2,384 Augustus equity shares for a total purchase price of $211,603.84;

N.      Pacific Investments and Technologies Ltd., a Hong Kong company, which, according to the Debtor's books and records, (i) has an address at 43-59 Queen's Road East, Suite 1607, 16/F, Dominion Centre, Wan Chai, Hong Kong HKSAR, and (ii) purchased 1,408 Augustus equity shares for a total purchase price of $124,974.08; and

O.      Chepstow Capital GmbH, a German company, which, according to the Debtor's books and records, (i) has an address at Graf-Bernadotte-Strasse 71, 45133 Essen, Germany, and (ii) purchased 282 Augustus equity shares for a total purchase price of $25,030.32.

5.      **Kevin Washington**.  Defendant Kevin Washington ("Washington"), an individual, who, upon information and belief, is a citizen of California, and the son of billionaire Dennis Washington.  He is believed to be a current owner of Atlas Power (f/k/a CryptoWatt Mining LLC), a wholly owned subsidiary of CryptoWatt Investment Partners.

6.      **Estate of Wolfgang Haupt.**  Wolfgang Haupt ("Haupt), a citizen of Germany before he died, was the founder and Chief Executive Officer (CEO) of Augustus from the date of its incorporation on June 29, 2018, until his resignation in or around late June of 2020.  Haupt is reported to have died in October of 2021 in a helicopter accident in Germany. The Estate of Wolfgang Haupt has been named a party in his stead.  Upon information and belief, Volker Haupt, a resident of Germany, is a representative of the Estate of Wolfgang Haupt.

6.      **William Mason**.  Defendant William Mason ("Mason") is an individual whose citizenship and current address are presently unknown.

7.    **Pascal Weinberger**.  Defendant Pascal Weinberger ("Weinberger"), an individual, who, upon information and belief, is a resident of German and, according to the Debtor's books and records, has an address at, Koenigsteiner Weg 18, 65835 Liederbach, Germany.  Weinberger served as Chief Artificial Intelligence Officer of Augustus and served on its Board of Directors from the date of incorporation through approximately June of 2020.

8.    **William Webster**.  Defendant William ("Bill") Webster ("Webster"), an individual, who, upon information and belief, is a resident of Florida, and whose current address is presently unknown.  Webster was the Chief Financial Officer (CFO) of Augustus from the date of its incorporation through approximately August of 2020.

9.    **Philip Amthor**.  Defendant Philip Amthor ("Amthor", and, together, with Weinberger and Webster, the "Former Officer/Director Defendants"), an individual, who, upon information and belief, is a citizen of Germany, and whose present address is currently unknown. Amthor was a member of the Board of Directors of Augustus from early 2019 until his resignation in or around March of 2020.  Upon information and belief, Amthor is a current member of German parliament, having served on the Committee on Internal Affairs and the Committee on European Affairs.

10.    **Christopher Kahn**.  Defendant Christopher Kahn ("Kahn"), an individual, who, upon information and belief, is a resident of New York, and whose present address is currently unknown.   Khan was an associate of Haupt and Weinberger and was hired in September 2019 to serve as Augustus' Financial Project Manager. Defendant Khan later served as Augustus' Deputy Chief Operating Officer (COO).

11.    **Rubicon Investment Partners, L.P.**  Defendant Rubicon Investment Partners, L.P. ("Rubicon"), is a Delaware limited partnership whose current address is presently unknown.

12.    **Rubicon Investment Partners (Cayman), L.P.**  Defendant. Rubicon Investment Partners (Cayman), Ltd. ("Rubicon Cayman"), is a Cayman Island limited company whose current address is presently unknown.

13.    **Doe Defendants**.  Party defendants named herein as Does 1 through 100, inclusive, are unknown individuals and/or corporate entities who received or are holding any Augustus assets which were subject to avoidance.  If and when true names and capacities of these Doe Defendants are ascertained, this Complaint will be amended to allege such information.

## JURISDICTION AND VENUE

14.    This adversary proceeding is brought pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

15.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 because the claims asserted herein arise in the above-captioned Chapter 11 case.

16.    This is a core proceeding under 28 U.S.C. § 157(b)(2).

17.    Venue is proper pursuant to 28 U.S.C. § 1409(a) because this proceeding is related to the Chapter 11 case, which is currently pending before this Bankruptcy Court.

18.    In the event that this Bankruptcy Court or any other appropriate court finds any part of this adversary proceeding to be "non-core," Plaintiff consents to the entry of final orders and judgments by the Bankruptcy Court, pursuant to Bankruptcy Rule 7008.  Plaintiff also consents to the entry of final orders or judgments by the Bankruptcy Court if it is determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## FACTUAL BACKGROUND

**The Origins of Augustus**

19.     On July 7, 2015, Haupt originally formed Banda Apparel LLC, a Delaware domestic limited liability company, which was renamed to "Augustus Collective LLC" as of November 29, 2016 ("Augustus Collective").  Haupt served as the managing member of Augustus Collective and formed it to act as a holding company to acquire equity positions in small businesses and certain strategic assets.

20.     On June 29, 2018, Augustus was incorporated in Delaware.  That same day, Augustus Collective was merged with and into Augustus (the "Conversion").  By operation of the Conversion, all assets of Augustus Collective became assets of Augustus by operation of law.

21.     Haupt was the controlling shareholder of Augustus at the time of the Conversion and served as its Chief Executive Officer and Chairperson of its Board of Directors, until he temporarily stepped down in the summer of 2020 and then formally resigned as CEO in November 2020.

22.     Haupt orchestrated the Conversion believing it would facilitate his efforts to raise capital for Augustus through a Series Seed round.  Using the "Intelligence" moniker, Haupt intended to communicate to potential investors that Augustus was embarked on developing a new wave of artificial intelligence software technology that could be licensed to U.S. and international commercial businesses operating in a variety of different industries.

23.     Upon information and belief, Washington, desiring to get out from under the shadow of his successful billionaire father by demonstrating his own ability to enter into successful business ventures, invested in CW Investment Partners, a partnership which owned CryptoWatt Mining LLC ("CW Mining").  CW Mining, in turn, owned and operated, directly or indirectly,

certain assets comprising two separate bitcoin mining datacenters located in or near Butte, Montana.

24.     In 2018, Haupt and Washington struck up a relationship where they discussed the benefits of combining Augustus' artificial intelligence capabilities with Washington's interest in the bitcoin mining datacenters.  The goal was to develop an infrastructure revenue model focused on cryptocurrency mining, with a key component of the plan being Augustus securing the rights to CW Mining's below-market power purchasing agreement for the two datacenters.

25.     In late 2018, Haupt, Webster and Weinberger developed detailed business plans for Augustus containing "datacenter revenue models" that projected Augustus earning multi-million dollars in datacenter revenues through cryptocurrency mining.

26.     In order to achieve these ambitious business plans, Haupt set a goal of raising over $80 million in new capital for Augustus.  The lynchpin to the plan was a partnership between Haupt and Washington whereby Haupt, through Augustus, would contribute the artificial intelligence expertise utilized to operate the cryptocurrency mining, and Washington would contribute the rights to the datacenters and some cash.  Haupt agreed to raise additional capital from outside investors, using his significant contacts with wealthy individuals both here in the United States and overseas in Europe.

27.     In order to be able to convince outside investors to invest in Augustus, Haupt needed to present Washington, the son of a billionaire, as the lead investor in Augustus.  The key to his fundraising efforts was to show that Washington had entered into an iron-clad subscription agreement where he committed to invest in Augustus.

28.     However, unbeknownst to Haupt at the time, Washington was not in a position to contribute the datacenters to Augustus as he did not have management control over CW Investment

Partners and CW Mining.  Further, Washington, through his counsel, Joon Hur ("Hur") of Loeb & Loeb, indicated that Washington did not want to bear the risk of an investment of this scale without substantial support from other investors.

**Haupt and Washington Conspire to Convince
Other Wealth Investors to Invest in Augustus**

29.     Haupt advised Washington and his attorneys that several wealthy individuals located in the United States and Europe were interested in investing in Augustus, and that Washington's $50 million investment was key to securing these additional investments.

30.     In screenshots of WhatsApp Message sent on November 22, 2018 between Hur and Augustus' general counsel, Ramsey Taylor ("Taylor"), Haupt previously indicated that he did not want any conditions attached to Washington's investment, stating "[o]bviously we are working on the other $30 million but we have to show other investors our lead investor, Kevin!."  Haupt also wrote: "I just want to show them ["the Contract we have with Kevin"] so they give the final signature and we can start putting the funds from their side into Augustus Intelligence."  Upon information and belief, the deal between Haupt and Washington nearly fell apart over the issue of who would commit first to invest: Washington or Haupt's outside investors.

31.     Upon information and belief, Haupt and Washington broke through this impasse during an in-person meeting they had at Haupt's apartment located in New York City on or around November 17, 2018.  At the New York meeting, Haupt and Washington agreed to a plan where Washington would execute a written, unconditional subscription agreement agreeing to invest $50 million in cash and in-kind assets into Augustus, and Haupt would use that agreement to raise at least $30 million in additional funds from outside investors.  Since the subscription agreement could not contain any financing contingency, Haupt and Washington agreed to house that condition in a secret, verbal side deal (the "Side Deal").

32.    After Haupt and Washington's meeting in New York, Taylor sent an email to Hur, dated November 22, 2018, advising that

> Wolfgang (and Kevin) now need to show the European investors that Kevin is in without contingencies – in order to bring in Barry Sternlicht. From what Wolfgang understood, Kevin is fully on board with bringing in Von Fink and Weber (each for $10 million) so that, they can make "an exception" for Sternlicht in the amount of $5 million. Gerry proposed, in a discussion that Wolfgang remembers well, a "gentleman's agreement" to make this happen. Wolfgang's intention is to fully honor the gentleman's agreement. We hope that you can go back to Kevin and help him see the larger picture here – e.g., getting Sternlicht to come on board. Wolfgang would like to go back to the 45 day timing concept, subject to the above.

33.    Upon information and belief, Barry Sternlicht was one of the wealthy investors, based in Miami, Florida, who was insistent that Haupt show proof of the commitment from the lead-investor, Washington, before he would consider investing.

34.    In a November 24, 2018 email to Loeb & Loeb, Taylor confirmed Haupt intended to use Washington's proposed Seed Investor Agreement to attract additional investors: "Bill [Webster] just told me that KW [Kevin Washington] and WH [Wolfgang Haupt] will be in meetings in Europe Monday morning. They would really like to show a signed agreement at those meetings.... Any chance we can do this all on Sunday.... [W]e are up against the wall here w/the Europeans."

**Washington and Haupt Execute Washington Seed Investor Agreement**

35.    On or about November 25, 2018, Washington, Augustus and the "Common Control Holders" (the Common Control Holders were Haupt and Vielharmonie Real GmbH) executed a Series Seed Preferred Stock Investment Agreement, dated as of November 26, 2018 (the "KW Seed Agreement").  Pursuant to the KW Seed Agreement, Washington agreed to purchase 563,327 shares of Series Seed Preferred stock of Augustus for a total price of $50,000,904.52 (the "Washington Purchase Price").    Of that amount, Washington was to pay to Augustus

$20,000,904.52 in cash and $30,000,000 in the form of "data center interests" identified in a schedule to the KW Seed Agreement (the "In-Kind Contribution").  Upon information and belief, Haupt and Washington both executed the KW Seed Agreement in the United States using DocuSign.

36.     The KW Seed Agreement provided that the purchase of the Series Seed Preferred stock was to close within forty-five days of the agreement date or January 10, 2019 (the "Closing Date"), unless otherwise agreed to by the parties, at which time Washington was to pay to the Company the cash portion of the Purchase Price by wire transfer and to pay to the Debtor the In-Kind Contribution by delivery to the Debtor of an assignment agreement.  (Section 1.2.1.)

37.     Section 8.8 of the KW Seed Agreement provides in relevant part that:

> Except as specified in Section 1.2.2, any term of this Agreement may be amended, terminated or waived (either generally or in a particular instance and either retroactively or prospectively) only with the written consent of the Company and the Purchasers holding a majority of the then-outstanding shares of Series Seed Preferred Stock and Preferred Class F Stock . . . .

38.     Neither Augustus nor the holders of a majority of the then-outstanding shares of Series Seed Preferred Stock and Preferred Class F Stock agreed in writing to extend the Closing Date.

39.     The KW Seed Agreement provides the following integration provision:

> **ENTIRE AGREEMENT**. This Agreement (Including the Exhibits and Schedules hereto) together with the Restated Charter constitute the full and entire understanding and agreement between the parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the parties is expressly canceled.

(Preamble, Paragraph 3.)

40.    The KW Seed Agreement further provides:

**Delays or Omissions**.  No delay or omission to exercise any right, power or remedy accruing to any party under this Agreement, upon any  breach or default of any other party under this Agreement, will impair any such right, power or remedy of such non-breaching or non-defaulting party nor will it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring, nor will any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.

(Section 8.10.)

41.    The KW Seed Agreement further provides:

**Attorney's Fees**.  If any action at law or in equity (including arbitration) is necessary to enforce or interpret the terms of this Agreement, the prevailing party will be entitled to reasonable attorneys' fees, costs, and necessary disbursements in addition to any other relief to which the party may be entitled

(Section 8.7.)

42.    Augustus performed all of its obligations under the KW Seed Agreement.

43.    In addition to the KW Seed Agreement, Augustus and Washington also entered into two written side agreements. In the first side agreement, referred to as the "Call Option Agreement," Washington purchased the right to acquire 585,950 Class F preferred shares from certain Augustus shareholders in exchange for a $200,000 cash contribution.  These shareholders, or "optioners," included Haupt, George Glueck, Weinberger, Daniel Bay, and Riesenmay, each of whom agreed to transfer a portion of their Class F shares to Washington on a pro-rata basis. Webster described this options deal as a "kickback" to Washington for his significant investment, and indicated that this was drafted as a side agreement—rather than being built into the KW Seed Agreement—so that Haupt could present Augustus as a "warrant free company."

44.    In the second side agreement, Haupt agreed, on Augustus' behalf, to reimburse Washington up to $200,000 for legal and travel fees incurred in connection with the KW Seed Agreement.

**Haupt and Washington Go on an Investor Fishing Tour Together**

45.    A few days after executing the KW Seed Agreement at the end of November 2018, Haupt and Washington flew to Europe for the express purpose of meeting with prospective wealthy investors about investing in Augustus.  During this investor fishing tour, Haupt and Washington traveled in style, staying at luxury hotels, having meals at fine, high-end restaurants and even attended a brothel in Berlin, Germany, all paid courtesy of Augustus's corporate credit card.  When not out entertaining themselves on Augustus's dime, Haupt and Washington attended breakfast and lunch meetings with prospective investors, including the Augustus Investors, to discuss the prospect of investing in Augustus.  At these meeting, Washington was introduced as the lead investor, having committed to invest over $50 million in Augustus.  When requested, Haupt, with Washington's full knowledge and consent, provided copies of the KW Seed Agreement as proof of Washington's investment.  Neither Haupt nor Washington informed the prospective investors at these meetings about the Side Deal when making these representations.

46.    After these in-person meetings, the Augustus Investors each executed separate subscription agreements, some in the United States and some in Europe, and wired their investments to Augustus in the United States.  At the time they made their investments, each of the Augustus Investors believed Augustus had secured $50 million from its lead investor, Washington.  They relied on this representation as it was critical to their decision to invest.

47.    Upon information and belief, Washington never intended to close on his obligations under the KW Seed Agreement because he was counting on the existence of the Side Agreement,

which, while unenforceable, would have been material to a reasonably prudent investor, such as the Augustus Investors, when making a decision whether or not to invest in Augustus.  No prudent investor, including the Augustus Investors, would have made a decision to invest had the existence of the Side Agreement been disclosed to them in advance.

48.     From November 26, 2018 until at least May of 2020, Augustus personnel, and Haupt in particular, continued to represent to prospective investors that Washington, the son of billionaire Dennis Washington, who owns numerous transportation and natural resource companies, was a "lead investor" in Augustus.

49.     Augustus distributed materially false and/or misleading information to actual and prospective investors regarding the amount and status of capital funds raised in the Company's Series Seed investment round. Specifically, the company made materially false and/or misleading representations in connection with an investment by Washington.

50.     Augustus made reference to a $50 million investment by Washington in its promotional materials, business plans, and referred to the investment in ad-hoc representations to prospective investors. Augustus at times included Washington on capitalization tables without indicating that his investment remained unfunded, and that the funding date had passed. Augustus touted Washington's investment as if it had been fully funded, despite having no assurance, and indeed significant doubt, that Washington would ever comply with his obligation to fund.

51.     In addition to misrepresenting the status of Washington's investment, individuals within Augustus, including Haupt and Webster, knew and withheld from investors information regarding the Side Deal.

**Washington Breaches His Obligations under the**
**KW Seed Agreement by Failing to Close**

52.     Notwithstanding that Augustus was ready, willing and able to close, Washington

failed to pay the Washington Purchase Price under the KW Seed Agreement.  Augustus remained

willing and able to transfer the 563,327 shares of Series Seed Preferred stock upon receipt of the

Washington Purchase Price.

53.     Washington's failure to pay the Washington Purchase Price amounted to a material

breach of the KW Seed Agreement.  Washington's breach of the KW Seed Agreement harmed

Debtor in the amount of $50,000,904.52.

**Augustus Suffers Financial Distress as a Result of Washington's Breach**
**of the KW Seed Agreement and Mason's Breach of His Subscription Agreement**

54.     By early 2019, Augustus had raised in excess of $35 million from the investors,

including nearly $30 million from the Augustus Investors, plus more than $60 million in promised

subscriptions in capital, at a $250 million pre-money valuation.

55.     In anticipation of closing of the KW Seed Agreement and implementing its bitcoin

mining business plan with the newly contributed datacenters, Augustus hired dozens of new

employees and expensive software engineers at a cost of millions of dollars.  However, the KW

Seed Agreement was never funded and these newly hired employees were eventually fired.

56.     In May-June 2020, certain German newspapers published various negative

newspaper articles about Augustus, Haupt and others, based primarily on claims asserted by certain

former employees.

57.     By that time, Augustus had spent more than $30 million of its initial capital raise

and a number of seed investors began raising concerns about the actions of prior management and

members of the Board of Directors (the "Old Board").  In June 2020, Haupt stepped down from

his positions as CEO and Chairman of the Old Board.  In July 2020, several shareholders decided to replace the entire Old Board with three new directors.  In November 2020, an additional board member was selected separately by the minority group of  investors to serve as an independent director, thus forming a new Board of Directors (the "New Board").

58.     On April 24, 2021 (the "Petition Date"), Augustus filed a voluntary petition for relief under chapter 11 (Subchapter V) of the Bankruptcy Code with the Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

59.     On May 3, 2022, the Debtor filed its Small Business Debtor's Revised First Amended Plan of Liquidation [D.I. 213] ("Plan").  The Plan provides for the transfer of all of the Debtor's assets, including causes of action, to the Augustus Trust to be pursued by the Trustee for the benefit of the Augustus Trust beneficiaries, including creditors and equity holders.  In addition, the Plan contained a procedure, approved by the Bankruptcy Court, whereby Augustus' non-insider equityholders could elect to assign their Assigned Litigation Claims to the Trustee to be pursued. The Augustus Investors executed such assignment agreements.

60.     On July 26, 2022, the Court entered its Findings of Fact, Conclusions of Law, And Order Confirming the Small Business Debtor's Revised First Amended Plan of Liquidation [D.I. 251] (the "Confirmation Order").

61.     The "Effective Date" under the Plan occurred on August 1, 2022.

## COUNT I
## Breach of Contract
### (Washington)

62.     Plaintiff incorporates by reference and realleges each of the foregoing paragraphs as though fully set forth herein.

63.     The KW Seed Agreement constitutes a valid and enforceable contract between Augustus and Washington.

64.     There are no conditions precedent to enforcement of the KW Seed Agreement.

65.     Pursuant to Section 1.21 of the KW Seed Agreement, Washington, as a committed investor in Augustus, was required to wire transfer 20 million dollars in cash to Augustus and to execute and deliver an assignment agreement to Augustus transferring a 19.6% equity interest in CryptoWatt, valued at $30 million, by January 10, 2019, which was forty-five (45) days after the KW Seed Agreement was executed (the "Closing Date").

66.     Defendant Washington materially breached the KW Seed Agreement by, among other things, failing to provide any portion of his investment to Augustus by the Closing Date. Upon information and belief, Washington was not in a position to close on the Closing Date even if he wanted to because he did not have the ability at the time to transfer the equity interest in CryptoWatt, which was mired in separate litigation among the parties.

67.     As a direct and proximate result of Washington's material breach of the KW Seed Agreement, Augustus has suffered at least $100 million in damages, not including interest, fees, and other costs.

## COUNT II
## Common Law Fraud
### (Washington and Haupt)

68.     Plaintiff restates and realleges the foregoing paragraphs, which are incorporated by reference as if fully set forth herein.

69.     Washington and Haupt made false misrepresentations to the Augustus Investors regarding the status of Washington's investment and failed to disclose the existence of the Side Deal and/or with actual knowledge that such false statements were being made to such investors,

for the purpose of influencing prospective investors to contribute funds to Augustus during the Series Seed Round.

70.     Haupt's entry into a Side Deal with Washington was not authorized or sanctioned by Augustus or its Board of Directors.

71.     As alleged herein, the Augustus Investors were injured by their reliance.

72.     Accordingly, Haupt and Washington are liable to Augustus Investors for fraud.

73.     Based on the foregoing, Plaintiff is entitled to recover from the Defendants Haupt and Washington an amount to be determined at trial, but no less than $30,000,000.

## COUNT III
### Aiding and Abetting Fraud
### (Washington, Haupt, and Webster)

74.     Plaintiff restates and realleges the foregoing paragraphs, which are incorporated by reference as if fully set forth herein.

75.     As alleged herein, Haupt and Washington committed an underlying fraud against the Augustus Investors.

76.     Webster substantially assisted in the commission of the fraud committed by Haupt by, among other things, disseminating to investors capitalization schedules, which falsely showed that Washington's investment and Mason's investment had been fully funded and failed to disclose to such investors the existence of the Side Deal.

77.     Based on the foregoing, Plaintiff is entitled to recover from Haupt, Washington and Webster an amount to be determined at trial, but no less than $30,000,000.

## COUNT IV
### Civil Conspiracy
### (Washington, Haupt, and Webster)

78.     Plaintiff incorporates by reference and realleges each of the foregoing paragraphs as though fully set forth herein.

79.     At the time that the KW Seed Agreement was entered into, Defendants Washington and Haupt entered into a verbal Side Deal by which Haupt and Washington agreed that they would not call upon Washington to fund the KW Seed Agreement unless and until Augustus obtained investments from other investors in the amount of 30 million dollars.

80.     The Side Deal is not enforceable under the terms of the KW Seed Agreement, which precludes verbal modification of its binding terms.

81.     Washington and Haupt concealed the existence of the Side Deal from prospective investors and certain officers and directors of the Company. They simultaneously solicited additional investments, knowing that investors would rely upon the material representation that Augustus had secured $50 million in assets from Washington, which, in fact, had not yet been secured.

82.     Washington and Haupt agreed to make false misrepresentations to investors regarding the status of Washington's investment and/or with actual knowledge that such false statements were being made to investors, for the purpose of influencing prospective investors to contribute funds to Augustus during the Series Seed Round.  Defendant Washington and Haupt's actions in furtherance of the conspiracy were unlawful.

83.     Webster substantially assisted in this conspiracy by, among other things, disseminating to investors capitalization schedules, which falsely showed that Washington's investment and Mason's investment had been fully funded, and failed to disclose to such investors the existence of the Side Deal, despite being aware of its existence.

84.     Haupt's entry into a Side Deal with Washington was not authorized or sanctioned by Augustus.

85.     As a direct and proximate result of the conduct of Haupt, Washington and Webster, Augustus suffered damages, including but not limited to, failing to timely secure the $50 million investment set forth in the KW Seed Agreement, the decline of the company, and loss of other opportunities and investments, resulting in at least $100 million dollars in damages, not including interest, fees, and other costs.

86.     As a direct and proximate result of the conduct of Haupt, Washington and Webster, the Augustus Investors suffered damages at least $30 million dollars in damages, not including interest, fees, and other costs investments.

**COUNT V**
**Securities Fraud Under § 10(b)**
**Of the Securities Exchange Act**
**(15 U.S.C. § 78(j)(b))**
**(Washington and Haupt)**

87.     Plaintiff restates and realleges the foregoing paragraphs, which are incorporated by reference as if fully set forth herein.

88.     Haupt and Washington falsely represented numerous material facts to the Augustus Investors in connection with their proposed investments in Augustus leading up to the execution of their Subscription Agreements and investments.

89.     Haupt and Washington knew their representations were false and made them with scienter, as evidenced by their distribution of the KW Seed Agreement and failure to disclose the Side Deal.

90.     These material misrepresentations and omissions were made in connection with the sale of Augustus securities.

91.     These material misrepresentations were conveyed by means of the mails and interstate telecommunications networks.

92.     The Augustus Investors reasonably relied on Haupt's and Washington's representations and warranties regarding the binding nature and enforceability of the KW Seed Agreement.  Haupt and Washington were in a position to know, had a duty to know and, in fact knew such information, whereas the Augustus Investors did not have equal, independent access to such information.

93.     Relying on Haupt's and Washington's material misrepresentations and omissions, the Augustus Investors executed their subscription agreements and paid their investments in exchange for equity securities in Augustus.

94.     Absent these misrepresentations and omissions, the Augustus Investors would not have entered into their subscription agreements and paid the investments in exchange for the equity securities of Augustus.

95.     The misrepresentations alleged herein (are not subject to the Safe-Harbor for Forward Looking Statements provision of the Securities Exchange Act (the "Exchange Act"), 15 U.S.C. § 78u-5(c), because the misstatements concerned known, historical facts, as well as future predictions that Haupt and Washington knew were baseless, material, and were not accompanied by meaningful cautionary language.

96.     The Augustus Investors were injured as a direct and proximate result of these fraudulent misrepresentations and omissions.

97.      Based on the foregoing, the Plaintiff as assignee of the Augustus Investors is entitled to recover from Haupt and Washington an amount to be determined at trial, but no less than $30,000,000.

## COUNT VI
## Securities Fraud Under 6 Del. C. §§ 73-201, 73-605
### (Washington and Haupt)

98.     Plaintiff restates and realleges the foregoing paragraphs, which are incorporated by reference as if fully set forth herein.

99.     Haupt and Washington falsely represented numerous material facts to the Augustus Investors in connection with their proposed investments in Augustus leading up to the execution of their Subscription Agreements and investments.

100.    Haupt and Washington knew their representations were false and made them with scienter, as evidenced by their distribution of the KW Seed Agreement and failure to disclose the Side Deal.

101.    These material misrepresentations and omissions were made in connection with the sale of Augustus securities.

102.    The Augustus Investors reasonably relied on Haupt's and Washington's representations and warranties regarding Washington's investment and Haupt and Washington, as parties to the KW Seed Agreement and the Side Deal were in a position to know, had a duty to know and, in fact knew such information, whereas the Augustus Investors did not have equal, independent access.

103.    Relying on Haupt's and Washington's material misrepresentations and omissions, the Augustus Investors executed their subscription agreements and paid their investment in exchange for equity securities in Augustus.

104.    Absent these misrepresentations and omissions, the Augustus Investors would not have entered into their subscription agreement and paid the investment in exchange for the equity securities of Augustus.

105.    The Augustus Investors were injured as a direct and proximate result of these fraudulent misrepresentations and omissions.

106.    Based on the foregoing, the Augustus Investors are entitled to recover from Haupt and Washington an amount to be determined at trial, but no less than $30,000,000.

**COUNT VII**
**Control Person Liability**
**Under Section 20(a) of the Exchange Act**
**(Washington and Haupt)**

107.    Plaintiff restates and realleges the foregoing paragraphs, which are incorporated by reference as if fully set forth herein.

108.    Haupt acted as controlling persons of Augustus within the meaning of Section 20(a) of the Exchange Act.  By virtue of his executive positions and/or ownership interests and contractual rights, Haupt had the power to influence and control, and did influence and control, directly or indirectly, the creation and dissemination of materially inaccurate and falsified financial statements, capital tables, and other information to the Augustus Investors, as well as material misrepresentations and omissions made in connection with the sale of Augustus securities.

109.    Washington acted as controlling persons of Augustus within the meaning of Section 20(a) of the Exchange Act.  By virtue of entering into the KW Seed Agreement, which was material to Augustus' business plan and the founding premise for Augustus' efforts to raise capital, Washington had the power to influence and control, and did influence and control, directly or indirectly, the dissemination of materially inaccurate and falsified statements, and other information to the Augustus Investors.

110.    Haupt was provided with or had unlimited access to Augustus' internal reports, press releases, public filings, and other statements alleged herein that were misleading prior to

and/or shortly after these statements were issued and had the ability to prevent their issuance or cause them to be corrected.

111.    Haupt had direct and supervisory involvement in the day-to-day operations of Augustus and/or control over major corporate decision and policy making, and therefore, had the power to control or influence the particular false statements and transactions giving rise to the fraud alleged herein.

112.    By reason of this control and their position with Augustus, Haupt and Washington had the authority to cause Augustus to engage and culpably participate in the fraud alleged herein.

113.    The Augustus Investors were injured as a direct and proximate result of Haupt's and Washington's actions.

114.    Based on the foregoing, the Augustus Investors are entitled to recover from Haupt and Washington an amount to be determined at trial, but no less than $30,000,000.

**COUNT VIII**
**Control Person Liability Under 6 Del. C. §§ 73-201, 73-605**
**(Washington and Haupt)**

115.    Plaintiff restates and realleges the foregoing paragraphs, which are incorporated by reference as if fully set forth herein.

116.    Haupt acted as controlling persons of Augustus within the meaning of within the meaning of § 73-605(b) of the Delaware Securities Act.  By virtue of his executive positions and/or ownership interests and contractual rights, Haupt had the power to influence and control, and did influence and control, directly or indirectly, the creation and dissemination of materially inaccurate and falsified financial statements, capital tables, and other information to the Augustus Investors, as well as material misrepresentations and omissions made in connection with the sale of Augustus securities.

117.    Washington acted as controlling persons of Augustus within the meaning of the Delaware Securities Act.  By virtue of entering into the KW Seed Agreement, which was material to Augustus' business plan and the founding premise for Augustus' efforts to raise capital, Washington had the power to influence and control, and did influence and control, directly or indirectly, the dissemination of materially inaccurate and falsified statements, and other information to the Augustus Investors.

118.    Haupt was provided with or had unlimited access to Augustus' Seller Defendants' internal reports, press releases, public filings, and other statements alleged herein to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent their issuance or cause them to be corrected.

119.    Haupt had direct and supervisory involvement in the day-to-day operations of Augustus and/or control over major corporate decision and policy making, and therefore, had the power to control or influence the particular false statements and transactions giving rise to the fraud alleged herein.

120.    By reason of this control and their position with Augustus, Haupt and Washington had the authority to cause Augustus to engage and culpably participate in the fraud alleged herein.

121.    The Augustus Investors were injured as a direct and proximate result of Haupt's and Washington's actions.

122.    Based on the foregoing, the Augustus Investors are entitled to recover from Haupt and Washington an amount to be determined at trial, but no less than $30,000,000.

**COUNT IX**
**Breach of Contract**
**(William Mason)**

123.    Plaintiff incorporates by reference and realleges each of the foregoing paragraphs as though fully set forth herein.

124.    Defendant Mason signed a Subscription Agreement on January 9, 2019 (the "Mason Subscription Agreement"), with Augustus, by which Mason would purchase 112,663 shares in Augustus for $10 million; however, Mason failed to fund this investment.

125.    Mason's name appeared on capitalization tables through at least October of 2019; however, Mason never funded his investment.

126.    The Mason Subscription Agreement constitutes an enforceable contract between Augustus and Mason.

127.    Mason's failure to fund his investment constitutes a breach of the Mason Subscription Agreement.

128.    There are no material conditions precedent to enforcement of the Mason Subscription Agreement, which have not been satisfied or waived.

129.    As a direct and proximate result of breach of the Mason Subscription Agreement, Augustus has suffered at least $10 million in damages, not including interest, fees, and other costs.

**COUNT X**
**Breach of Fiduciary Duties**
**(Haupt and Former Officer/Director Defendants)**

130.    Plaintiff incorporates by reference and realleges each of the foregoing paragraphs as though fully set forth herein.

131.    By reason of their positions as officers, directors and/or fiduciaries of Augustus, and because of their ability and duty to control the business and corporate affairs of the Augustus, Haupt

and the Former Officer/Director Defendants owed Augustus and its shareholders fiduciary obligations of due care, good faith, loyalty and candor, and were and are required to use their utmost ability to control and manage Augustus in a fair, just, honest and equitable manner.

132.    Each director and officer of Augustus owed Augustus and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of Augustus' affairs and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

133.    Haupt and the Former Officer/Director Defendants, because of their positions of control and authority as directors and/or officers of Augustus, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Due to their positions with Augustus, each of Haupt and the Former Officer/Director Defendants had knowledge of material non-public information regarding the Company.

134.    To discharge their duties, Haupt and the Former Officer/Director Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of Augustus. By virtue of such duties, Haupt and the Former Officer/Director Defendants were required to, among other things:

>    a.    Exercise good faith to ensure that the affairs of Augustus were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

>    b.    Exercise good faith to ensure that Augustus was operated in a diligent, honest and prudent manner and complied with all applicable federal, state and foreign laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

>    c.    Exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports, public statements, or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of Augustus;

d.      Refrain from unduly benefiting themselves and other Augustus insiders at the expense of Augustus; and

e.      When put on notice of problems with Augustus' business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

135.    Haupt and the Former Officer/Director Defendants breached their duties of loyalty, care and good faith by: (i) failing to implement and enforce a system of effective internal controls and procedures; (ii) failing to exercise their oversight duties by not monitoring Augustus' compliance with Augustus procedures and federal and state regulations; (iii) consciously disregarding and failing to ensure that Augustus' marketing materials and financial documents were proper and accurate; and/or (iv) failing to exercise good faith in taking appropriate corrective action upon learning of same.

136.    Despite holding officer and director positions with Augustus, Augustus held no Board meetings until approximately May of 2020, only after information pertaining to the status of Washington's investment became known to other investors. The lack of proper corporate procedures and controls did not allow the fiduciaries to diligently operate Augustus in the best interests of its shareholders.

137.    Haupt and each of the Former Officer/Director Defendants knew or should have known that Augustus had failed to secure the Washington investments, failed to take measures to call in the investment upon learning of its status, and failed to ensure the accuracy of ongoing representations made by Augustus to its investors upon learning of this information.

138.    Haupt and each of the Former Officer/Director Defendants knew or should have known that Augustus had failed to secure the Mason investment, but which nonetheless appeared on capitalization tables.

139.    Defendants Haupt, Weinberger and Webster further breached their duties of loyalty, care, and good faith by intentionally, knowingly, recklessly, and/or negligently providing false or misleading information to prospective and actual investors concerning: (a) Washington's status as an investor, (b) Augustus' revenue models as well as the amount and sources of its revenues for fiscal years 2018 and 2019, (c) the illicit use of Augustus' funds, (d) the capital funds raised through the Series Seed investment round, (e) the existence of side-letter agreements that affected the liquidity of Augustus' assets, and (f) Augustus' patents and technology from 2018 to 2020.

140.    Defendants Webster and Haupt further breached their duties of loyalty, care, and good faith by engaging in self-dealing through their intentional, knowing, and/or reckless misappropriation of Augustus funds upon their acceptance of loans and/or cash advances from Augustus without approval from the Board of Directors.

141.    As a direct and proximate result of Haupt and the Former Officer/Director Defendants' actions, Augustus has suffered damages in excess of $100 million, not including interest, fees, and other costs.

## COUNT XI
## Conversion – Augustus Crypto Wallets
### (Haupt, Kahn, Rubicon, Rubicon Cayman, and John Does 1-10)

142.    Plaintiff incorporates by reference and realleges each of the foregoing paragraphs as though fully set forth herein.

143.    Upon information and belief, Augustus holds ownership interests in certain cryptocurrencies wallets.

144.    Augustus obtained its ownership interests in these cryptocurrency wallets by virtue of Haupt's contribution to Augustus (the "Augustus Crypto Wallets").

145.    Upon information and belief, Haupt, Khan, Rubicon, Rubicon Cayman and/or John Does 1-10 transferred cryptocurrencies from the Augustus Crypto Wallets to other (not Augustus-

owned) cryptocurrency wallets and traded the Augustus cryptocurrencies on trading platforms, such as Binance, Kraken 4, and Gemini.

146.    Haupt was the majority owner of an unregistered cryptocurrency hedge fund known as "Rubicon" (formerly Augustus Digital Assets) and Defendant Khan was responsible for overseeing the funds daily operations.

147.    The cryptocurrencies contained in the Augustus Crypto Wallets were diverted into other cryptocurrency wallets.

148.    By transferring the cryptocurrencies from the Augustus Crypto Wallets and trading them on cryptocurrency exchanges without the Board's approval, Haupt, Khan, Rubicon and/or Rubicon Cayman intentionally interfered with the Company's dominion and control over its cryptocurrencies.

149.    Haupt, Khan, Rubicon and/or Rubicon Cayman's interference deprived Augustus of the possession and use of its cryptocurrencies.

150.    As a direct and proximate result of Haupt, Khan, Rubicon and/or Rubicon Cayman's wrongful conduct, Augustus has suffered damages in excess of one million dollars.

**COUNT XII**
**Constructive Fraudulent Transfer**
**(11 U.S.C. §§ 548(a)(1)(B) and 550)**
**(Haupt, Khan, Rubicon, Rubicon Cayman, and John Does 1-10)**

151.    The Plaintiff restates and realleges the foregoing paragraphs, which are incorporated by reference as if fully set forth herein.

152.    In the alternative, to the extent any cryptocurrencies contained in the Augustus Crypto Wallets were transferred to Haupt, Khan, Rubicon, Rubicon Cayman and/or John Does 1-10, Augustus did not receive reasonably equivalent value in exchange for such transfer.

153.    At the time of such transfer, Augustus was either insolvent or became insolvent as a result of such transfer.  Specifically, Augustus (i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (ii) was engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with Augustus was an unreasonably small capital; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

154.    Any transfer of the cryptocurrencies contained in the Augustus Crypto Wallets was a transfer of property, or an interest in property, of Augustus to or for the benefit of defendant Haupt, Khan, Rubicon, Rubicon Cayman and/or John Does 1-100.   Any transfer of the cryptocurrencies contained in the Augustus Crypto Wallets occurred within two years of the Petition Date.

155.    Neither defendant Haupt, Khan, Rubicon, Rubicon Cayman nor John Does 1-10 received any of the cryptocurrencies contained in the Augustus Crypto Wallets in good faith or for value.

156.    Any transfer of the cryptocurrencies contained in the Augustus Crypto Wallets was a transfer of property, or an interest in property, of Augustus to or for the benefit of defendant Haupt, Khan, Rubicon, Rubicon Cayman and/or John Does 1-10.

157.    Each of the defendants is an initial transferee, or the immediate, mediate, or subsequent transferee, of the cryptocurrencies contained in the Augustus Crypto Wallets.

158.    Any transfer of the cryptocurrencies contained in the Augustus Crypto Wallets should be avoided and recovered from the defendants, pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550(a).

## COUNT XIII
## Constructive Fraudulent Transfer
### (11 U.S.C. §§ 544 and 550 and 6 Del. C. §§ 1304(a)(2) and 1305(a))
### (Haupt, Khan, Rubicon, Rubicon Cayman, and John Does 1-10)

159.    The Plaintiff restates and realleges the foregoing paragraphs, which are incorporated by reference as if fully set forth herein.

160.    In the alternative, to the extent any cryptocurrencies contained in the Augustus Crypto Wallets were transferred to defendants Haupt, Khan, Rubicon, Rubicon Cayman and/or John Does 1-10, Augustus did not receive reasonably equivalent value in exchange for such transfer.

161.    At the time of such transfer, the Augustus was either insolvent or became insolvent as a result of such transfer.  Specifically, Augustus (i) was insolvent at the time or became insolvent as a result of such transfer; (ii) was engaged or was about to engage in a business or a transaction for which the remaining assets of Augustus were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that Augustus would incur, debts beyond Augustus' ability to pay as such debts became due.

162.    Any transfer of the cryptocurrencies contained in the Augustus Crypto Wallets was a transfer of property, or an interest in property, of Augustus to or for the benefit of defendant Haupt, Khan, Rubicon, Rubicon Cayman and/or John Does 1-10.

163.    The transfer of the cryptocurrencies contained in the Augustus Crypto Wallets occurred within four years of the Petition Date.

164.    Neither Haupt, Khan, Rubicon, Rubicon Cayman nor any of the Doe Defendants received any of the cryptocurrencies contained in the Augustus Crypto Wallets  in good faith or for value.

165.    Each of the defendants is an initial transferee, or the immediate, mediate, or subsequent transferee, of the cryptocurrencies contained in the Augustus Crypto Wallets.

166.    The transfer of the cryptocurrencies contained in the Augustus Crypto Wallets should be avoided and recovered from the defendants pursuant to 11 U.S.C. §§ 544 and 550 and §§ 1304(a)(2) and 1305(a) of the Delaware Uniform Fraudulent Transfer Act ("DUFTA").

**COUNT XIV**
**Constructive Fraudulent Transfer**
**(11 U.S.C. §§ 544 and 550 and  (N.Y. D.C.L. §§ 270-281)**
**(Haupt, Khan, Rubicon, Rubicon Cayman, and John Does 1-10)**

167.    The Plaintiff restates and realleges the foregoing paragraphs, which are incorporated by reference as if fully set forth herein.

168.    In the alternative, to the extent any cryptocurrencies contained in the Augustus Crypto Wallets  were transferred to defendants Haupt, Khan, Rubicon, Rubicon Cayman and/or John Does 1-10, the Debtor did not receive reasonably equivalent value in exchange for such transfer.

169.    At the time of such transfer, Augustus was either insolvent or became insolvent as a result of such transfer.  Specifically, (i) at a fair valuation, the sum of Augustus's debts was greater than the sum of the Augustus' assets; (ii) Augustus was engaged or was about to engage in a business or a transaction for which the remaining assets of Augustus were unreasonable small in relation to the business or transaction; and/or (iii) Augustus intended to incur, or believed or reasonably should have believed that it would incur, debts beyond Augustus's ability to pay as they became due.

170.    Any transfer of the cryptocurrencies contained in the Augustus Crypto Wallets  was a transfer of property, or an interest in property, of Augustus to or for the benefit of defendants Haupt, Khan, Rubicon, Rubicon Cayman and/or John Does 1-10.

171.    The transfer of the cryptocurrencies contained in the Augustus Crypto Wallets occurred within four years of the Petition Date.

172.    Each of the defendants is an initial transferee, or the immediate, mediate, or subsequent transferee, of the cryptocurrencies contained in the Augustus Crypto Wallets.

173.    The transfer of the cryptocurrencies contained in the Augustus Crypto Wallets should be avoided and recovered from the defendants pursuant to 11 U.S.C. §§ 544 and 550 and to §§ 270-281 of New York Debtor and Creditor Law ("NY-UVTA").

**COUNT XV**
**Turnover**
**(11 U.S.C. § 542)**
**(Haupt, Khan, Rubicon, Rubicon Cayman, and John Does 1-10)**

174.    The Plaintiff restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

175.    In the alternative, to the extent any cryptocurrencies contained in the Augustus Crypto Wallets, or a portion thereof, are in the possession, custody or control of any of the defendants Haupt, Khan, Rubicon, Rubicon Cayman and/or John Does 1-10, such cryptocurrencies contained in the Augustus Crypto Wallets rightfully constitute property of the Debtor's estate.

176.    The cryptocurrencies contained in the Augustus Crypto Wallets  were purchased using monies from the Debtor or its predecessor Augustus Collective and rightfully constitute property of the Debtor's estate.

177.    The cryptocurrencies contained in the Augustus Crypto Wallets  can be used to satisfy claims of the Debtors' legitimate creditors.

178.    The cryptocurrencies contained in the Augustus Crypto Wallets are valued at over $1 million, and, therefore are not of inconsequential value or benefit to the Augustus Trust.

179.    The cryptocurrencies contained in the Augustus Crypto Wallets, or any portion thereof in the custody, possession and/or control of any of defendants Haupt, Khan, Rubicon, Rubicon Cayman and/or John Does 1-10, should be turned over to the Trust pursuant 11 U.S.C. § 542.

## COUNT XVI
## Breach of Fiduciary Duties
### (Kahn)

180.    Plaintiff incorporates by reference and realleges each of the foregoing paragraphs as though fully set forth herein.

181.    By reason of his position as an employee and officer of Augustus, Kahn owed Augustus fiduciary obligations of due care, good faith, loyalty and candor, and was required to perform his duties for Augustus in a fair, just, honest and equitable manner.

182.    As part of his duties, he was tasked with serving as Augustus' representative on the Board of Directors of Augustus Commerce, LLC, a majority owned subsidiary of Augustus ("Augustus Commerce").   Under his employment arrangement with Augustus, Kahn was not entitled to any additional compensation for his service on the Augustus Commerce Board.

183.    On November 17, 2020, following a mass layoff of employees at Augustus, Augustus terminated Khan's employment. Augustus also removed him from his duties with Augustus Commerce.  The following day, Khan presented a demand letter to Augustus Commerce, demanding payment of $100,000 in severance.  This demand for severance pay was predicated on an unauthorized and unenforceable document which Khan, conspiring with the other Augustus Commerce Board members, crafted and had approved by the Augustus Commerce Board on the eve of termination of their employment purportedly entitling each Board member to $100,000 severance in exchange for their services.

184.    Augustus and Augustus Commerce both rejected Kahn's demand and the parties ended up arbitrating the dispute before the Employment Arbitration Tribunal of the American Arbitration Association, AAA Case No. 01-20-0016-0083.   At the conclusion of the arbitration on September 28, 2021, the arbitrator, Hon. Carol E. Heckman (Ret.), issued a written decision ruling against Kahn and finding that he engaged in self-dealing and wrongdoing conduct by failing to disclose and get approval for his self-awarded severance in clear conflict of interest with his employer, Augustus (the "Kahn Arbitration Ruling").

185.    Kahn breached his duties of loyalty, care and good faith by engaging in self-dealing and wrongdoing conduct by failing to disclose and get approval for his self-awarded severance in clear conflict of interest with his employer, Augustus.

186.    As a direct and proximate result of Kahn's actions, Augustus has suffered damages in excess of $50,000, not including interest, fees, and other costs.

## PRAYER FOR RELIEF

**WHEREFORE**, by reason of the foregoing, Plaintiff respectfully requests that judgment be entered in his favor and against the defendants as follows:

(a)    on Count I, against Washington for breach of contract, and entering judgment in an amount to be determined at trial, but no less than $100 million in damages, not including interest, fees, and other costs;

(b)    on Count II, against Washington and Haupt for common law fraud and entering judgment in an amount to be determined at trial, but no less than $30 million in damages, not including interest, fees, and other costs;

(c)    on Count III, against Washington, Haupt, and Webster, for aiding and abetting fraud and entering judgment in an amount to be determined at trial,

but no less than $30 million in damages, not including interest, fees, and other costs;

(d)     on Count IV, against Washington, Haupt, and Webster for civil conspiracy and entering judgment in an amount to be determined at trial, but no less than $100 million in damages, not including interest, fees, and other costs;

(e)     on Count V, against Washington, Haupt, and Webster for Securities Fraud under § 10(b) of the Securities Exchange Act (15 U.S.C. § 78(j)(b)) and entering judgment in an amount to be determined at trial, but no less than $30 million in damages, not including interest, fees, and other costs;

(f)     on Count VI, against Haupt and Washington for Securities Fraud Under 6 Del. C. §§ 73-201, 73-605 and entering judgment in an amount to be determined at trial, but no less than $30 million in damages, not including interest, fees, and other costs;

(g)     on Count VII, against Haupt and Washington for Control Person Liability under Section 20(a) of the Exchange Act and entering judgment in an amount to be determined at trial, but no less than $30 million in damages, not including interest, fees, and other costs;

(h)     on Count VIII, against Haupt and Washington for Control Person Liability under 6 Del. C. §§ 73-201, 73-605 and entering judgment in an amount to be determined at trial, but no less than $30 million in damages, not including interest, fees, and other costs;

(i)     on Count IX, against William Mason for breach of contract, and entering judgment in an amount to be determined at trial, but no less than $10 million in damages, not including interest, fees, and other costs

(j)     on Count X, against Haupt and the Former Officer/Director Defendants for breach of fiduciary duties and entering judgment in an amount to be determined at trial, but no less than $100 million in damages, not including interest, fees, and other costs;

(k)     on Count XI, against Haupt, Khan, Rubicon, Rubicon Cayman and/or John Does 1-10 for conversion, and entering judgment in an amount to be determined at trial, but no less than $1 million in damages, not including interest, fees, and other costs;

(l)     on Count XII, pursuant to 11 U.S.C. §§ 548 and 550, finding against Haupt, Khan, Rubicon, Rubicon Cayman and/or John Does 1-10 (i) that the transfer of cryptocurrencies contained in the Augustus Crypto Wallets was a constructive fraudulent transfer, (ii) avoiding the transfer, and (iii) entering judgment in an amount to be determined at trial, but no less than the then fair market value of such transferred cryptocurrencies contained in the Augustus Crypto Wallets, plus interest, fees, and other costs;

(m)     on Count XIII, pursuant to 11 U.S.C. §§ 544 and 550 and §§ 1304(a)(2) and 1305(a) of the DUFTA, finding against Haupt, Khan, Rubicon, Rubicon Cayman and/or John Does 1-10 (i) that the transfer of cryptocurrencies contained in the Augustus Crypto Wallets was a constructive fraudulent transfer, (ii) avoiding the transfer, and entering judgment in an amount to

be determined at trial, but no less than the then fair market value of such transferred cryptocurrencies contained in the Augustus Crypto Wallets, plus interest, fees, and other costs;

(n)      on Count XIV, pursuant to 11 U.S.C. §§ 544 and 550 and §§ 270-281 of NY-UVTA, finding against Haupt, Khan, Rubicon, Rubicon Cayman and/or John Does 1-10 (i) that the transfer of cryptocurrencies contained in the Augustus Crypto Wallets was a constructive fraudulent transfer, (ii) avoiding the transfer, and   entering judgment in an amount to be determined at trial, but no less than the then fair market value of such transferred cryptocurrencies contained in the Augustus Crypto Wallets, plus interest, fees, and other costs;

(o)      on Count XV, against Haupt, Khan, Rubicon, Rubicon Cayman and/or John Does 1-10 who received any of cryptocurrencies contained in the Augustus Crypto Wallets, directing immediate turnover to the Trustee of such cryptocurrencies contained in the Augustus Crypto Wallets  pursuant to 11 U.S.C. § 542;

(p)      on Count XVI, against Kahn for breach of fiduciary duties and entering judgment in an amount to be determined at trial, but no less than $50,000 in damages, not including interest, fees, and other costs;

(r)      Awarding Plaintiff his reasonable attorneys' fees, costs and necessary disbursements incurred investigating and prosecuting the claims herein;

(s)      Awarding costs and other damages as provided by statute; and

   (t)  Awarding such other and further relief as the Court deems equitable, just

and proper.

Dated:  April 23, 2023     **ARCHER & GREINER, P.C.**

          */s/ Bryan J. Hall*
          Bryan J. Hall (No. 6285)
          300 Delaware Avenue, Suite 1100
          Wilmington, DE 19801
          Tel.: 302.777.4350
          Fax:  302.777.4352
          bjhall@archerlaw.com

          -and-

          **THOMPSON COBURN HAHN & HESSEN LLP**

          Mark T. Power (admitted *pro hac vice*)
          488 Madison Avenue
          New York, New York 10022
          Telephone: (212) 478-7200
          Facsimile: (212) 478-7400
          Email: mpower@hahnhessen.com

          *Co-Counsel for the Augustus Trustee*

227082090 v1