# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | (Small Business Subchapter V) |
| AUGUSTUS INTELLIGENCE, INC., ) | |
| ) | Case No. 21-10744 (TMH) |
| Debtor. ) | (Jointly Administered) |
| ) | |
| ) | |
| BRIAN RYNIKER, in his capacities as ) | |
| Litigation Trustee of Augustus Intelligence, Inc. ) | |
| and as Assignee of Certain Investors, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Adv. Pro. No. 23-50370 (TMH)[1] |
| ) | |
| KEVIN WASHINGTON, *et al..*, ) | |
| ) | |
| Defendants. ) | Re: Adv. D.I. Nos. 37 & 38 |

## MEMORANDUM OPINION

Plaintiff, Brian Ryniker (the "**Trustee**") commenced this action against defendant Kevin Washington ("**Washington**" or "**Defendant**"), among others, in two separate capacities. First, in his capacity as post-confirmation trustee of the litigation trust (the "**Litigation Trust**") of the debtor, Augustus Intelligence Inc. ("**Augustus**" or "**Debtor**") the Trustee asserts several claims on behalf of the estate (the "**Estate Claims**").[2] Second, in his capacity as assignee, the Trustee

---

[1] Citations to the docket in this adversary proceeding will be made using the abbreviation "Adv. D.I. ___" and citations to the docket in the underlying bankruptcy case will be made using the abbreviation "D.I. _____".

[2] The Estate Claims include Count I (breach of contract – Washington), Count IX (breach of contract - Mason), Count X (breach of fiduciary duty – former directors and officers), Count XI (conversion), Count XII (constructive fraud – Bankruptcy Code), Count XIII (constructive fraud – Delaware law), Count XIV (constructive fraud – New York law), Count XV (turnover), and Count XVI (breach of fiduciary duty – Kahn).

asserts a set of claims on behalf of certain investors,[3] who assigned their claims (many of which are against the same defendants as the Estate Claims) to the Trust post-confirmation (the "**Assigned Investor Claims**").[4]

Defendant Washington has moved to dismiss one of the Estate Claims (Count I), and all of the Assigned Investor Claims (Counts II through VIII) of the complaint (the "**Complaint**"), pursuant to Rules 9(b), 12(b)(1), and 12(b)(6) of the Federal Rule of Civil Procedure, incorporated herein by Rules 7009 and 7012 of the Federal Rules of Bankruptcy Procedure.[5] For the reasons set forth below, the Motion is granted.

## FACTS AS ALLEGED IN THE COMPLAINT

The following facts are taken from the Complaint and are accepted as true for purposes of this Opinion:

Wolfgang Haupt ("**Haupt**") was the founder and CEO of Debtor Augustus, a company designed to develop and deliver artificial intelligence solutions across a variety of industries.[6] Augustus was incorporated in Delaware in 2018.[7]

Shortly after forming Augustus, Haupt struck up a relationship with Defendant Washington, who held an indirect investment in CryptoWatt Mining LLC ("**CW Mining**"), a company whose assets included two bitcoin mining data centers.[8] The two discussed the

---

[3] The investors are Larisse SA, Valnon Holding GmbH, Jaws Equity Owner 113, LLC, Lohengrin Beteiligungsgesellschaft mbH, Manfred Swarovski Jr., KRC Beteiligungs GmbH, Spitzberg Ventures GmbH, Elisabeth Swarovski, Kirsten Hager, Lumber Lane Investments LLC, Gembec I LLC, Mark and Susan Didea, Stefan von Liechtenstein, Pacific Investments and Technologies Ltd., and Chepstow Capital GmbH (collectively, the "**Investors**").
[4] The Assigned Investor Claims include Count II (common law fraud), Count III (aiding and abetting fraud), Count IV (civil conspiracy), Count V (securities fraud – federal law), Count VI (securities fraud – Delaware law), Count VII (control person liability, federal law), and Count VIII (control person liability – Delaware law).
[5] Motion to Dismiss (the "**Motion**"), Adv. D.I. 37.
[6] Complaint, Adv. D.I. 1, at 5, 8.
[7] *Id.* at 8.
[8] *Id.* at 8-9.

benefits of combining Augustus' artificial intelligence capabilities with Washington's interest in bitcoin mining. The goal of these discussions was "to develop an infrastructure revenue model focused on cryptocurrency mining, with a key component of the plan being Augustus securing the rights to CW Mining's below-market power purchasing agreement for the two datacenters."[9] Haupt developed a detailed business plan in which Haupt would provide artificial intelligence to conduct the cryptocurrency mining, while Washington would provide the rights to the data centers and a significant cash contribution. To achieve these plans, Haupt set a goal to raise over $80 million in new capital for Augustus.[10]

Haupt's strategy for attracting interest in outside investors was to present Washington as the lead investor in Augustus.[11] Washington is the son of a billionaire and Haupt believed that an investment from him would carry great weight with other possible investors due to his status.[12] To that end, Haupt proposed that Washington invest $50 million first, so Haupt could show the other investors that Washington was committed. Washington, however, was reluctant to invest first, as he did not want to bear the risk of an investment of this scale without substantial support from other investors.[13]

Haupt and Washington eventually worked through this impasse by agreeing to a plan in which Washington would execute a written, unconditional subscription agreement detailing the terms of a $50 million investment by Washington, and Haupt would use that agreement to raise at least $30 million in funds from outside investors. Since the subscription agreement could not

---

[9] *Id.* at 9.
[10] *Id.*
[11] Complaint at 9.
[12] *Id.* at 8.
[13] *Id.* at 10.

contain any financing contingency, Haupt and Washington agreed to house that condition in a secret, verbal side deal (the "**Side Deal**").[14]

On November 25, 2018, the parties executed a Series Seed Preferred Stock Investment Agreement (the "**Seed Agreement**") which provided that Washington would purchase over half a million shares of Series Seed preferred stock of Augustus for just over $50M, made up of $20 million in cash and $30 million in the form of data center interests.[15]

Immediately after signing the Seed Agreement, Haupt and Washington traveled across Europe together for the purpose of meeting with prospective Augustus investors. At these meetings, Washington was introduced as the lead investor, who committed to investing over $50 million in Augustus. When requested, Haupt, with Washington's knowledge and consent, provided copies of the Seed Agreement as proof of Washington's investment. Neither Haupt nor Washington disclosed the existence of the Side Deal to the potential investors.

After these in-person meetings, the Investors each executed separate subscription agreements, some in the United States and some in Europe, and wired their investments to Augustus. At the time they made their investments, each of the Investors believed Augustus had secured $50 million from its lead investor, Washington.[16] By early 2019, Augustus had raised $30 million from the Investors, plus $60 million in promised subscriptions at a $250 million pre-money valuation.

In anticipation of closing on the Seed Agreement and implementing its bitcoin mining business plan, Augustus hired dozens of new employees and expensive software engineers at a cost of millions of dollars. However, Washington never paid the $50 million and the Seed

---

[14] *Id.* at 10.
[15] *Id.* at 11-12.
[16] *Id.* at 14.

Agreement never closed.[17] The newly hired employees were fired and bad press about Augustus followed.

On April 24, 2021, Augustus filed a voluntary petition for relief under chapter 11 (subchapter V) of the Bankruptcy Code.

On May 3, 2022, the Debtor filed its plan of reorganization.[18] The Plan provided for the transfer of all the Debtor's assets, including causes of action, to the Litigation Trust to be pursued by the Trustee for the benefit of the Litigation Trust beneficiaries, including creditors and equity holders. In addition, the Plan contained a procedure whereby Augustus' non-insider equity holders could elect to assign their Assigned Litigation Claims to the Trustee to be pursued. The Investors executed the assignment agreements. The Plan was confirmed on July 26, 2022.[19]

On April 23, 2023, the Trustee commenced this adversary proceeding.

## **JURISDICTION**

The Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b) and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.[20] Venue is proper pursuant to 28 U.S.C. § 1409(a).

---

[17] *Id.* at 16.
[18] Revised First Amended Plan of Liquidation ("**Plan**"), D.I. 213.
[19] Findings of Fact, Conclusions of Law, And Order Confirming the Small Business Debtor's Revised First Amended Plan of Liquidation ("**Confirmation Order**"), D.I. 251.
[20] This includes the portions of the Complaint over which, as discussed below, I find the Court lacks jurisdiction. *Liquidating Trustee of the MPC Liquidating Trust v. Granite Financial Solutions, Inc. (In re MPC Computers, LLC)*, 465 B.R. 384, 387 (Bankr. D. Del. 2012) ("A court has jurisdiction to determine whether or not it has subject matter jurisdiction over a proceeding.").

**DISCUSSION**

I. **Subject Matter Jurisdiction**

    A. <u>Legal Standard</u>

A motion for lack of subject-matter jurisdiction made pursuant to Rule 12(b)(1) "is an objection to the federal court's power to adjudicate a case." *In re PennySaver USA Publ'g, LLC*, 587 B.R. 43, 46 (Bankr. D. Del. 2018). "As a rule, the burden of establishing that the Court has the requisite jurisdiction falls on the party invoking the federal court's jurisdiction." *Id.*

Defendant Washington first argues that this Court lacks subject matter jurisdiction over the Assigned Investor Claims because they are claims among non-debtors that have no relation to the bankruptcy case.

"[B]ankruptcy courts have subject matter jurisdiction over four types of matters, pending referral from the district court: '(1) cases under title 11, (2) proceedings arising under title 11, (3) proceedings arising in a case under title 11, and (4) proceedings related to a case under title 11.'" *In re Millennium Lab Holdings II, LLC*, 562 B.R. 614, 621 (Bankr. D. Del. 2016) (quoting 28 U.S.C. § 157). "Cases falling under the first three categories are typically referred to as core proceedings, whereas proceedings 'related to' a case under title 11 are designated as non-core proceedings." *Id.* at 621. The Third Circuit has held that a matter is "core" if it "invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case." *In re Marcus Hook Dev. Park, Inc.*, 943 F.2d 261, 267 (3d Cir. 1991) (quoting *Beard v. Braunstein*, 914 F.2d 434, 444 (3d Cir. 1990); s*ee also* 28 U.S.C. § 157(b)(1)(B) (setting forth non-exhaustive list of the types of matters that are considered "core" proceedings).

"Distinctions between 'arising under,' 'arising in' (both core) and 'related to' (non-core) proceedings are not relevant to a determination of subject matter jurisdiction when the proceeding has been filed before plan confirmation." *In re Penson Worldwide, Inc.*, 587 B.R. 6, 12 (Bankr. D. Del. 2018). "Post-confirmation, however, bankruptcy jurisdiction over non-core proceedings narrows; it exists only if there is 'a close nexus to the bankruptcy plan or proceeding.' In contrast, in core proceedings the close nexus test does not apply; bankruptcy jurisdiction remains the same as it was pre-confirmation." *Penson*, 587 B.R. at 12. As the parties here agree that the claims at issue in Defendant's Motion are not "core" matters, jurisdiction over them turns on whether the "close nexus" test is satisfied. *See Resorts Int'l Fin., Inc. v. Price Waterhouse & Co. (In re Resorts Int'l., Inc.)*, 372 F.3d 154, 166-67 (3d Cir. 2004) (after a plan of reorganization has been confirmed, "the essential inquiry" to determine whether a Bankruptcy Court has jurisdiction over non-core proceedings is "whether there is a close nexus to the bankruptcy plan or proceeding.").

"At the post-confirmation stage, the claim must affect an integral aspect of the bankruptcy process–there must be a close nexus to the bankruptcy plan or proceeding." *In re Resorts Int'l, Inc.*, 372 F.3d 154, 167 (3d Cir. 2004). "To a certain extent, litigation trusts by their nature maintain a connection to the bankruptcy even after the plan has been confirmed." *Id.* "The question is how close a connection warrants post-confirmation bankruptcy jurisdiction." *Id.* "Matters that affect the interpretation, implementation, consummation, execution, or administration of the confirmed plan will typically have the requisite close nexus." *Id.* "Under those circumstances, bankruptcy court jurisdiction would not raise the specter of 'unending jurisdiction' over continuing trusts."

7

B. <u>Analysis</u>

The Trustee makes several arguments in support of jurisdiction. First, he argues that this Court's continued jurisdiction over this matter was expressly contemplated by the parties and provided for in the Plan and the Confirmation Order.[21] This argument is not persuasive. Retention of jurisdiction provisions within a plan alone are insufficient to grant subject matter jurisdiction because "neither the bankruptcy court nor the parties can write their own jurisdictional ticket." *Resorts Int'l Fin., Inc. v. Price Waterhouse & Co. (In re Resorts Int'l., Inc.)*, 372 F.3d 154, 161 (3d Cir. 2004). In other words, "[i]f there is no jurisdiction under 28 U.S.C. § 1334 or 28 U.S.C. § 157, retention of jurisdiction provisions in a plan of reorganization or trust agreement are fundamentally irrelevant." *Id.* Bankruptcy courts may give effect to such provisions only where there is subject matter jurisdiction underlying the action. *Id.* Thus, where the matter falls within the "related to" category of jurisdiction, retention of jurisdiction provisions are effective only where the dispute shares the requisite close nexus to the bankruptcy.

The Trustee acknowledges that the provisions do not themselves confer jurisdiction but argues that they provide proof of a close nexus, citing the *AstroPower* decision, where the Court held that the retention of jurisdiction provision's inclusion of the specific cause of action at issue demonstrated a close nexus between the claim and the bankruptcy case. *AstroPower Liquidating Tr. v. Xantrex Tech., Inc. (In re AstroPower Liquidating Tr.)*, 335 B.R. 309, 325 (Bankr. D. Del.

---

[21] *See* Plan §6.4 (providing "[t]he Bankruptcy Court shall retain jurisdiction of this case with regard to the following matters: . . . (v) to adjudicate any cause of action which may exist in favor of the Debtor, including preference and fraudulent transfer causes of action and Assigned Litigation Claims; and (vi) to hear any other matter not inconsistent with the provisions of the Bankruptcy Code"); Confirmation Order ¶ 30 ("[t]he Court will retain jurisdiction over the Chapter 11 Case, all matters arising out of or related to the Chapter 11 Case and the Plan, the matters set forth in Article XIV of the Plan, and other applicable provisions of the Plan, including jurisdiction to . . . e) adjudicate any Cause of Action, including Avoidance Actions and Assigned Litigation Claims").

8

2005). But *AstroPower* is distinguishable on its facts. There, as the Court noted, the Plan "specifically describe[d] an action over which the Court had 'related to' jurisdiction pre-confirmation and expressly provide[d] for the retention of such jurisdiction to liquidate that claim for the benefit of the estate's creditors[.]" *Id.* Here, however, unlike the claims at issue in *AstroPower*, the Assigned Investor Claims are neither claims over-which the Court had pre-confirmation jurisdiction, nor claims that will be liquidated for the benefit of the estate's creditors. They are instead third-party claims never subject to this Court's jurisdiction, which will be liquidated for the benefit of only those equity holders who assigned them. In other words, the Assigned Investor Claims are claims by non-debtors against non-debtors. As the Third Circuit has made clear, "bankruptcy jurisdiction will not extend to a dispute between non-debtors unless the dispute creates 'the logical possibility that the estate will be affected.'" *In re Resorts Int'l, Inc.*, 372 F.3d 154, 165 (3d Cir. 2004) (quoting *In re Federal–Mogul Global, Inc.*, 300 F.3d 368, 380 (3d Cir.2002)). The dispute at the center of the Assigned Investor Claims does not.

The Trustee disagrees, noting that in the event any proceeds arise from a combination of both Assigned Investor Claims and Estate Claims the Plan provides that such proceeds would be shared by all creditors.[22] But the fact that the Plan provides for this remote contingency is not enough. Even in the event of such a scenario, the logical outcome would be that the proceeds would be allocated along claim lines. In other words, the Investors would still likely be the only ones to receive proceeds arising from the Assigned Investor Claims and the only proceeds likely to be allocated to the creditor body as a whole are those arising from Estate Claims. Thus, even

---

[22] *See* Plan at 3-8.

9

under the "combination proceeds" scenario, the dispute at the center of the Assigned Investor Claims is not one that will affect the estate in its entirety.

For these reasons, the Motion is granted with respect to Counts II through VIII for lack of subject matter jurisdiction.

## II.  Failure to State a Claim

### A.  Legal Standard

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) serves to test the sufficiency of the complaint, and a court's role is to determine whether the plaintiff is entitled to offer evidence in support of its claims. *Semerenko v. Cendant Corp.*, 223 F.3d 165, 173 (3d Cir. 2000); *Paul v. Intel Corp. (In re Intel Corp. Microprocessor Antitrust Litig.)*, 496 F. Supp. 2d 404, 407 (D. Del. 2007) (citing *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993)). To survive a motion to dismiss, a plaintiff must allege well-pleaded facts with sufficient detail to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (*citing Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

The Third Circuit has adopted a two-part analysis that courts must employ when deciding a motion to dismiss for failure to state a claim. *Fowler*, 578 F.3d at 210. "First, the factual and legal elements of a claim should be separated" with the reviewing court accepting "all of the complaint's well-pleaded facts as true, but . . . disregard[ing] any legal conclusions." *Id*. at 210-11. Next, the reviewing court must "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id*. (quoting *Iqbal*, 556 U.S. at 679); *Gellert v. Coltec Indus., Inc. (In re Crucible Materials Corp.)*, Nos. 09-11582 & 11-53885, 2012 WL 5360945, at *3 (Bankr. D. Del. Oct. 31, 2012). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant

has acted unlawfully." *Iqbal*, 556 U.S. at 679. "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. Proc. 8(a)(2)). This "plausibility" determination will be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

B.  <u>Analysis</u>

With the dismissal of the Assigned Investor Claims, only one claim remains against Defendant Washington.  In Count I, the Trustee asserts a claim for breach of contract arising out of Washington's failure to provide the $50 million consideration contemplated by the Seed Agreement.  Washington raises several arguments as to why the Trustee has failed to state a claim for breach of contract, but I need only reach the first: that the contract is unenforceable.

Washington argues that the Trustee's breach of contract claim is barred by the doctrine of *in pari delicto*.  "*In pari delicto*, Latin for 'in equal fault,' is a general rule that courts will not extend aid to either of the parties to a criminal act or listen to their complaints against each other but will leave them where their own act has placed them." *Geronta Funding v. Brighthouse Life Ins. Co.*, 284 A.3d 47, 64 (Del. 2022) (internal citations omitted).  A separate concept, but one that often overlaps with *in pari delicto* is the principle that agreements made for the purpose of perpetrating a fraud are unenforceable.  15 CORBIN ON CONTRACTS § 85.1 (2025) (noting that it is an "accepted tenet of contract law" that bargains made for the purpose of defrauding third persons "contradict[] public policy and cannot be enforced).  While the parties refer to the two concepts interchangeably, it is the latter that is mostly clearly applicable here.

Though the precise argument varied in form across the briefing and at oral argument, the crux of Washington's position is that because the Debtor was alleged to be at least equally

responsible for the fraudulent scheme to use the Seed Agreement to lure investors, the Trustee (who stands in the shoes of the Debtor) is now barred from enforcing it. I agree.

The Trustee alleges in the Complaint that the primary purpose of the Seed Agreement was to convince prospective investors that Washington was already committed to invest $50 million, even though, pursuant to parties' the Side Agreement, he was not:

> 27. <u>In order to be able to convince outside investors to invest in Augustus, Haupt needed to present Washington, the son of a billionaire, as the lead investor in Augustus. The key to his fundraising efforts was to show that Washington had entered into an iron-clad subscription agreement where he committed to invest in Augustus.</u>
>
> 28. However, unbeknownst to Haupt at the time, Washington was not in a position to contribute the datacenters to Augustus as he did not have management control over CW Investment Partners and CW Mining. Further, [Washington's counsel], Joon Hur ("<u>Hur</u>") [ ], indicated that <u>Washington did not want to bear the risk of an investment of this scale without substantial support from other investors</u>.
>
> 29. Haupt advised Washington and his attorneys that several wealthy individuals located in the United States and Europe were interested in investing in Augustus, and that <u>Washington's $50 million investment was key to securing these additional investments.</u>
>
> 30. In screenshots of WhatsApp Message sent on November 22, 2018 between Hur and Augustus' general counsel, Ramsey Taylor ("<u>Taylor</u>"), Haupt previously indicated that he did not want any conditions attached to Washington's investment, stating "[o]bviously we are working on the other $30 million but we have to show other investors our lead investor, Kevin!." Haupt also wrote: "<u>I just want to show them ["the Contract we have with Kevin"] so they give the final signature and we can start putting the funds from their side into Augustus Intelligence</u>." Upon information and belief, the deal between Haupt and Washington nearly fell apart over the issue of who would commit first to invest: Washington or Haupt's outside investors.

*   *   *   *

> 45. [ ] Haupt and Washington attended breakfast and lunch meetings with prospective investors, including the Augustus Investors, to discuss the prospect of investing in Augustus. At these meeting, Washington was introduced as the lead investor, having committed to invest over $50 million in Augustus. <u>When requested, Haupt, with Washington's full knowledge and consent, provided copies of the KW Seed Agreement as proof of Washington's investment. Neither Haupt</u>

> nor Washington informed the prospective investors at these meetings about the Side Deal when making these representations.
>
> 46. After these in-person meetings, the Augustus Investors each executed separate subscription agreements, some in the United States and some in Europe, and wired their investments to Augustus in the United States. At the time they made their investments, each of the Augustus Investors believed Augustus had secured $50 million from its lead investor, Washington. They relied on this representation as it was critical to their decision to invest.
>
> 47. Upon information and belief, Washington never intended to close on his obligations under the KW Seed Agreement because he was counting on the existence of the Side Agreement, which, while unenforceable, would have been material to a reasonably prudent investor, such as the Augustus Investors, when making a decision whether or not to invest in Augustus. No prudent investor, including the Augustus Investors, would have made a decision to invest had the existence of the Side Agreement been disclosed to them in advance.[23]

These allegations demonstrate that the Seed Agreement was not just incidental to the alleged fraud, it was the cornerstone of the entire plan. This is perhaps most apparent in a single allegation, which states:

> Haupt and Washington agreed to a plan where Washington would execute a written, unconditional subscription agreement agreeing to invest $50 million in cash and in-kind assets into Augustus, and Haupt would use that agreement to raise at least $30 million in additional funds from outside investors. Since the subscription agreement could not contain any financing contingency, Haupt and Washington agreed to house that condition in a secret, verbal side deal [ ].[24]

The only reasonable conclusion to be drawn from these alleged facts is that the Seed Agreement was entered into for the purpose of perpetrating a fraud and is therefore an illegal contract.

"[C]ourts generally will not enforce an illegal contract based upon 'the elementary principle that one who has himself participated in a violation of law cannot be permitted to assert in a court of justice any right founded upon or growing out of the illegal transaction.'" *Sender v. Simon*, 84 F.3d 1299, 1307 (10th Cir. 1996) (quoting *Gibbs & Sterrett Mfg. Co. v. Brucker*, 111

---

[23] Complaint ¶¶ 27 – 47.
[24] Complaint ¶ 31.

U.S. 597, 601 (1884)). The facts of the *Sender* case are remarkably similar to those alleged here. There, the bankruptcy trustee asserted claims against investors in a limited partnership to recover distributions received by the investors that exceeded their contributions and were therefore in violation of the partnership agreement. The investors moved for summary judgment on the grounds that the partnership agreement was unenforceable because the partnership was created as part of an illegal Ponzi scheme. The Court agreed:

> Though the Debtor Partnerships were not illegal per se, it is beyond peradventure they were created and operated in furtherance of a fraudulent and illegal investment scheme. To the extent HSA L.P. was created as a vehicle to further the Ponzi scheme and utilized to give the scheme a veneer of legitimacy, it was in utter complicity with Mr. Donahue's fraud. HSA L.P., acting through Mr. Donahue and HIA Inc., fraudulently induced the participation of Mr. Simon and the Baker Partnership in the scheme by misrepresenting both the true nature of the Hedged Investments fund and the partnership's role in perpetuation of the fraud. In other words, with regard to its interactions with Mr. Simon and the Baker Partnership, HSA L.P.'s purpose was an illegal one. It furthered this illegal purpose by fraudulently inducing Mr. Simon and the Baker Partnership to execute the partnership agreements.
>
> Mr. Sender, standing in the shoes of HSA L.P., now seeks to enforce the partnership agreements against Mr. Simon and the Baker Partnership. Following the suggestions of our fellow jurists, this court will not aid in the enforcement of an agreement that was fraudulently procured in furtherance of an illegal purpose. *See Merrill*, 77 Bankr. at 857; *Tri-Q*, 404 P.2d at 498. That Mr. Sender acts as a trustee in bankruptcy cannot lend strength to the partnership's position.

*Sender v. Simon*, 84 F.3d 1299, 1307 (10th Cir. 1996).

This analysis applies with equal force to the facts of this case. The facts alleged in the Complaint make clear that the Seed Agreement was a tool created to lend legitimacy to and offer assurances about an otherwise risky investment proposal. While the Trustee argues that the underlying transaction here, unlike the Ponzi scheme in *Sender*, was not illegal, this does nothing to alter the analysis. The unwillingness of courts to enforce illegal contracts is not limited to contracts that are illegal on their face:

> A bargain may be illegal by reason of the wrongful purpose of one or both of the parties making it. This is true even though the performances bargained for are not in themselves illegal and even though in the absence of the illegal purpose the bargain would be valid and enforceable. A party who makes such a bargain in furtherance of his wrongful purpose cannot enforce it….

*Tri-Q, Inc. v. Sta-Hi Corp.,* 63 Cal. 2d 199, 404 P.2d 486, 498 (Cal. 1965) (quoting 6A Corbin on Contracts § 1518, at 744 (1962)).  Here, even assuming the Seed Agreement, standing alone, is lawful, the fact that it was allegedly used by the Debtor in furtherance of a fraud compels the conclusion that the Debtor is barred from enforcing the agreement as a matter of public policy.

For these reasons, Count I of the Complaint is also dismissed.

The parties shall confer and submit an appropriate form of order under certification of counsel.

Dated: March 26, 2025

_____
John T. Dorsey, U.S.B.J.